IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILL A DUFFY, INC., | No. C-08-00878 EDL |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| MERLE SCOTT, | |
| Defendant. | |

Plaintiff Bill A. Duffy, Inc. is a corporation providing management services to professional athletes, and Defendant Merle Scott is a certified sports agent. The parties entered into a business relationship under which Defendant would act as a sports agent in connection with Plaintiff. The business relationship ended, and Plaintiff filed this lawsuit alleging claims for breach of contract, conversion, money had and received and constructive trust. Defendant filed counterclaims for tortious interference with a contractual relationship, tortious interference with prospective economic relationships, conversion, money had and received, constructive trust, unjust enrichment and quantum meruit. Before the Court is Plaintiff's Motion for Partial Summary Judgment as to Defendant's tortious interference claims, and Defendant's Motion for Partial Summary Judgment as to Plaintiff's claims for conversion, money had and received and constructive trust. The Court held a hearing on April 7, 2009. For the reasons stated at the hearing and in this Order, Plaintiffs' Motion is granted and Defendant's Motion is granted in part and denied in part.
.

**BACKGROUND FACTS**

The document entitled "Agreement with Merle Scott, Effective April 1, 2004" purports to establish the contractual relationship between Plaintiff and Defendant with respect to Defendant's recruitment of basketball players for clubs in the National Basketball Association ("NBA"). Defendant denies executing the April 1, 2004 Agreement, although he testified that the signature on the Agreement looked like his and that one of the fax numbers on the header of the document was his at the time of the fax.[1] See Declaration of John Conger in Supp. of Pl.'s Mot. for Partial Summ. J. ("Conger Decl. in Supp. of Pl.'s Mot.") at Ex. A at 117:9-118:15. Even if the written contract was not binding, it is undisputed that the parties conducted their business relationship in accordance with the terms of that agreement at least for the first two years, with the exception of player Mike James. See id. at 43:6-19; 46:1-50-25; 56:22-58:24; 65:8-22. During the third year, the parties mutually agreed to change their business relationship so that Defendant received more commission. See id. at 70:9-71:7.

Defendant executed several Standard Player Agent Contracts ("SPAC") with players during his affiliation with Plaintiff. See Conger Decl. in Supp. of Pl.'s Mot. Ex. B. Defendant acknowledged that those SPACs were obtained through Defendant's efforts as a sports agent exclusively in conjunction with Plaintiff (see id. Ex. A at 126:23-127:3), and that he did not compete with Plaintiff during that time. See id. at 127:10-13.

In 2006, Plaintiff informed Defendant that he was disappointed with Defendant's performance and that Defendant's termination was imminent. See Declaration of Mia Fraser in Opp. to Pl.'s Mot. for Partial Summ. J. ("Fraser Decl. in Opp. to Pl.'s Mot.") Ex. 3 at 144:1-145:20. In April 2007, the business relationship was terminated. See Conger Decl. in Support of Pl.'s Mot. Ex. A at 136:16-18.

**LEGAL STANDARD**

Summary judgment shall be granted if: "the pleadings, depositions, answers to

---

[1] It is dubious whether Defendant's signature was forged on the April 2004 Agreement. The expert report purporting to establish forgery is not properly authenticated and is inconclusive as to forgery in any event. See Declaration of Mia Fraser in Opp. to Pl.'s Mot. for Partial Summ. J. at Ex. C.

2

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The court must view the facts in the light most favorable to the non- moving party and give it the benefit of all reasonable inferences to be drawn from those facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. Id. If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.

**DISCUSSION**

**1.    Plaintiff's Motion for Partial Summary Judgment**

Plaintiff seeks summary judgment as to Defendant's counterclaims for tortious interference with contractual relationship and tortious interference with prospective economic relationships. Defendant alleges in his counterclaims that Plaintiff interfered with the SPACs between Defendant and several basketball players, and interfered in the prospective economic relationship between Defendant and several other basketball players by trying to meet with, or give money to, the players or their families in order to induce that player to sign with Plaintiff instead of Defendant. Defendant also argues that Plaintiff tortiously interfered with the endorsement contract with adidas

3

International Marketing[2] for player Leandro Barbosa.

Plaintiff moved for partial summary judgment of the tortious interference claims with respect to all players involved in relationships with Defendant. Defendant opposed Plaintiff's Motion for Partial Summary Judgment only as to players Leandro Barbosa, as an example of a contractual relationship, and Brandon Wright, as an example of a prospective economic relationship. See Def.'s Opp. to Pl.'s Mot. for Partial Summ. J. at 4, n. 1; at 9, n. 2. Defendant purported to reserve his right to raise additional triable issues of fact with respect to other contractual relationships and prospective relationships with other players. Id. As stated at the hearing, however, the time to raise all triable issues of fact as to any players based on the claims challenged by Plaintiff is at the summary judgment stage. See Walker v. Hoffman, 583 F.2d 1073, 1075 (9th Cir. 1978) ("A party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risks the possibility that there will be no trial. A summary judgment motion is intended to 'smoke out' the facts so that the judge can decide if anything remains to be tried."). Therefore, to the extent that the tortious interference claims relate to players other than Mr. Barbosa or Mr. Wright, Plaintiff's Motion for Partial Summary Judgment is granted.

A pivotal issue with respect to the tortious interference claims is whether Defendant was Plaintiff's agent. See Cal. Civ. Code § 2330 ("An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent from transactions within such limit, if they had been entered into on his own account, accrue to the principal."). Even though the question of agency is normally one of fact, where, as here, the facts are undisputed, the issue can be decided as a matter of law. See Magnecomp Corp. v. Athene Co., Ltd., 209 Cal.App.3d 526, 536 (1989). Plaintiff argues that neither of the tortious interference claims can survive summary judgment because Defendant was acting as an agent for Plaintiff, so Plaintiff is not a true third party to the contractual relationship who can be potentially liable for interfering with it:

> California recognizes a cause of action against noncontracting parties who interfere with the performance of a contract. "It has long been held that a stranger to a contract

---

[2] As reflected in the endorsement contract, "adidas" is not capitalized. See Conger Decl. in Support of Pl.'s Mot. for Partial Summ. J. at Ex. B at SCOTT00193-00213.

> may be liable in tort for intentionally interfering with the performance of the contract." . . . However, consistent with its underlying policy of protecting the expectations of contracting parties against frustration by outsiders who have no legitimate social or economic interest in the contractual relationship, the tort cause of action for interference with a contract does not lie against a party to the contract.

Allied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal.4th 503, 513 (1994) (internal citations omitted).

As stated at the hearing, the Court concludes that Defendant has failed to raise a triable issue of fact as to agency, and that Defendant acted as Plaintiff's agent. Defendant testified that he was affiliated with Plaintiff from April 2004 through April 2007, during which time his duties were to "utilize [his] contacts to recruit players and sign basketball players." Conger Decl. in Supp. of Pl.'s Mot. Ex. A at 125:1-11; 136:16-18. His efforts to perform those duties were exclusively in conjunction with Plaintiff. Id. at 126:23-127:3. Defendant operated a BDA office in Miami, Florida, and when he approached recruits, he identified himself as affiliated with Plaintiff. Id. at 127:6-13; 178:25-179:7. Plaintiff promoted Defendant by including him in brochures, touting him in press releases, and giving him public recognition, all with Defendant's approval. Id. at 233:12-24. Defendant was not in competition with Plaintiff. Id. at 127:10-14. With respect to at least some clients, fees were paid to Plaintiff and then Plaintiff paid Defendant. Id. at 166:13-167:2. Further, Plaintiff testified that he designated Defendant as the agent for player Leonardo Barbosa, showing that Defendant had authority to act on Plaintiff's behalf. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 194:10-13.

Defendant argues that the nature of the parties' relationship is contested, but he did not provide any evidence to contradict Plaintiff's showing, which is based primarily on Defendant's own testimony. Defendant argues that Plaintiff did not exercise sufficient control over Defendant for Defendant to be considered to be Plaintiff's agent. See In re Coupon Clearing Service, Inc., 113 F.3d at 1099 ("The other important aspect in determining the existence of an agency relationship is the degree of control exercised by the principal over the activities of the agent."). In support of his showing of lack of control, Defendant relies on a declaration from Walter Box, who was involved with the prospective business relationship with Mr. Wright. Mr. Box testified that he worked as a recruiter for Defendant, and was not compensated by Plaintiff. See Declaration of Walter Box

("Box Decl.") at ¶¶ 3-4. He testified that he and Defendant cultivated a relationship with Mr. Wright and his mother, and that Plaintiff did not have any contact with Mr. Wright. See id. ¶¶ 6-10. Mr. Box also testified that Plaintiff did not allow Defendant to take part in a meeting with Mr. Wright, his mother and his coach at Mr. Wright's university. See id. ¶ 16. The admissible portion of the Box declaration (which also contains considerable inadmissible hearsay, as discussed below) does not establish a lack of control by Plaintiff over Defendant. To the contrary, it shows some control insofar as the declaration shows that Plaintiff presided over the meeting with Mr. Wright's mother and coach, while Defendant stayed silent. Further, Defendant testified about aspects of Plaintiff's control, including that Plaintiff required him to submit weekly progress reports concerning his recruiting activities, and his failure to submit all the required reports resulted in the assessment of fines. See Declaration of Scott Harper in Supp. of Pl.'s Mot. for Partial Summ. J. Ex. A at 73:25-75:23.

Defendant also argues that he was an independent contractor with Plaintiff rather than an agent. However, "[a]gency and independent contractorship are not necessarily mutually exclusive legal categories as independent contractor and servant or employee are. In other words, an agent may also be an independent contractor. One who contracts to act on behalf of another and subject to the other's control, except with respect to his physical conduct, is both an agent and an independent contractor." Magnecomp, 209 Cal.App.3d at 537, n.2 (internal citations omitted); see also In re Coupon Clearing Service, Inc., 113 F.3d 1091, 1100 (9th Cir. 1997). Here, even assuming that there is a triable issue of fact as to Defendant's status as an independent contractor with Plaintiff, the undisputed facts establish that he was also Plaintiff's agent. In any case, the evidence does not support Defendant's argument that he always functioned as an independent contractor. The player contracts do not identify Defendant as an independent contractor. Moreover, the SPAC with player Jumaine Jones (Conger Decl. Ex. B at SCOTT00122-124), is between Plaintiff and the player, with Defendant signing on behalf of Plaintiff.

**Tortious interference with a contractual relationship**

To prevail on a claim for tortious interference with a contractual relationship under California law with respect to Leandro Barbosa, Defendant must prove that: (1) an enforceable

6

contract existed between Defendant and Mr. Barbosa; (2) Plaintiff had knowledge of the existence of the contract; (3) Plaintiff's intentional acts were designed to induce Mr. Barbosa to breach or disrupt the contractual relationship with Defendant; (4) the contractual relationship was actually breached or disrupted; and (5) Plaintiff's acts proximately caused damages to Defendant.[3] See Summit Mach. Tool Mfg. v. Victor CNS Sys., 7 F.3d 1434, 1442 (9th Cir. 1993) (quoting Charles V. Chapman Building Co. v. California Mart, 2 Cal.App.3d 846, 853 (1970)).

After meeting with Mr. Barbosa, Defendant traveled to Brazil to meet with Mr. Barbosa and his family because of Defendant's interest in Mr. Barbosa as a potential client. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 4 at 16:12-25. On September 21, 2004, Defendant signed a SPAC with Mr. Barbosa. See Conger Decl. in Supp. of Pl.'s Mot. Ex. B at SCOTT00147-150. Plaintiff's name does not appear on the SPAC. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 194:10-24. The contract was signed while Defendant was affiliated with Plaintiff. Mr. Barbosa testified that he understood that Mr. Duffy was his representative. See Conger Decl. Ex. D at 19:24-20:5 ("I signed with Bill to be my agent because Mr. Merle worked with him and Bill was my agent. Another thing. The only way I signed with Bill was because my mother said to me to sign with Bill because my mother never liked Mr. Merle.").

After Plaintiff informed Defendant that their business relationship was terminating, Plaintiff initially instructed Mr. Barbosa's financial manager, Larry Harmon, to remit payments from Mr. Barbosa's NBA contract to Plaintiff instead of Defendant, who was the agent of record on the SPAC. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 307:15-19. However, when Plaintiff spoke to the NBA player's union and was told that payments should be submitted to Defendant as the agent of record, Plaintiff instructed Mr. Harmon instead to continue to forward the payments to Defendant. See id. at 307:20-308:1. Mr. Barbosa testified that he never objected to Defendant receiving the

---

[3] Plaintiff argues by analogy that Defendant must also prove that Plaintiff's acts were independently wrongful because the interference is alleged with respect to an "at-will" contract that can be terminated by either the player or the agent, relying on a tortious interference case involving an at-will employment contract rather than a business contract like the one at issue in this case. See Reeves v. Hanlon, 33 Cal.4th 1140, 1151-52 (2004) (holding that inducing the termination of an at-will employment relation may be actionable under the standard applicable to claims for intentional interference with prospective economic relationships). In the absence of California authority extending this requirement to other kinds of at-will agreements, this Court will not do so.

payments from the NBA contract. See id. Ex. 4 at 60:14-17. The undisputed evidence is that Mr. Harmon continued without interruption to pay Defendant under the NBA contract based on his status as the agent of record for Mr. Barbosa. See, e.g., Opp. at 7:8-10; Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 216:10-22; 218:3-12; 310:5-8; Ex. 1 at 107:6-17. Plaintiff also communicated with Mr. Barbosa's subsequent financial manager, Dave Harbor, that payments from the SPAC were to be paid to Defendant. See Fraser Decl. in Supp. of Def.'s Mot. Ex. 1 at 310:2-8. Thus, there was no actual disruption or breach of the contract.

Mr. Barbosa also had an endorsement contract with adidas that was negotiated during the time that Defendant was Plaintiff's agent. See Conger Decl. in Supp. of Pl.'s Mot. Ex. A at 189:9-18. Plaintiff testified that Defendant negotiated this contract with adidas in consultation with Plaintiff and under Plaintiff's supervision. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 256:2-8; 257:3-12. The contract provided for payments to be made directly to Plaintiff. See Conger Decl. in Supp. of Pl.'s Mot. Ex. B at SCOTT00211. Defendant testified that the payments on the adidas contract were to be split evenly between Plaintiff and Defendant. See id. Ex. A at 194:20-195:6. Plaintiff instructed Mr. Harmon to make payments on the adidas contract to Plaintiff (see Fraser Decl. Ex. 3 at 308:4-10), and Mr. Harmon testified that he made all payments under the adidas contract to Defendant directly (see Fraser Decl. Ex. 1 at 106:6-10). Mr. Harmon testified that it was industry standard to pay commissions on endorsement contracts to the agent who negotiated the deal, which in this case he believed to be Defendant. See Fraser Decl. Ex. 1 at 142:8-145:21. Plaintiff further testified that he instructed Mr. Harbor to make the payments on the adidas contract to Plaintiff, and that Mr. Harbor made those payments to Plaintiff. See Fraser Decl. Ex. 3 at 309:9-15.

The analysis of the claim for tortious interference with the contractual relationship based on the SPAC differs from the analysis of the claim regarding interference with the adidas endorsement contract. Because Defendant was acting as Plaintiff's agent when Defendant signed the SPAC with Mr. Barbosa, the rights and liabilities under the SPAC accrued to Plaintiff as Defendant's principal. See Cal. Civ. Code § 2330 ("An agent represents his principal for all purposes within the scope of his actual or ostensible authority, and all the rights and liabilities which would accrue to the agent

8

1 from transactions within such limit, if they had been entered into on his own account, accrue to the
2 principal."). Therefore, Plaintiff was not a stranger to the Barbosa SPAC, and could not be liable for
3 tortious interference with that contract. See Allied Equipment Corp. v. Litton Saudi Arabia Ltd., 7
4 Cal.4th 503, 513 (1994) ("'It has long been held that a stranger to a contract may be liable in tort for
5 intentionally interfering with the performance of the contract.' . . . However, consistent with its
6 underlying policy of protecting the expectations of contracting parties against frustration by
7 outsiders who have no legitimate social or economic interest in the contractual relationship, the tort
8 cause of action for interference with a contract does not lie against a party to the contract.") (internal
9 citation omitted). Moreover, even if Defendant had raised a triable issue of fact as to Plaintiff's
10 tortious interference with the Barbosa contracts by telling Mr. Barbosa that it was in Mr. Barbosa's
11 best interest to stay with Plaintiff instead of going with Defendant (see Fraser Decl. in Opp. to Pl.'s
12 Mot. Ex. 1 at 68:15-69:2; Ex. 2 at 40:16-41:22), the undisputed evidence is that there was no actual
13 breach or disruption of the player contract.[4] Defendant continued to be paid under it without
14 interruption. Accordingly, Defendant has not raised a triable issue of fact as to Plaintiff's tortious
15 interference with the Barbosa SPAC.

16 By contrast, the parties to Mr. Barbosa's adidas contract are adidas and Mr. Barbosa, even
17 though Defendant signed the contract as Mr. Barbosa's "agent." See Conger Decl. in Supp. of Pl.'s
18 Mot. Ex. B at SCOTT00193-213. The contract specifically states that Mr. Barbosa "appointed BDA
19 Sports Management ("the Agency") to act as [Mr. Barbosa's] agent" under that agreement, and that
20 "adidas International is instructed to make any payments due to the Agency on [Mr. Barbosa's]
21 behalf." See id. at SCOTT00211. Thus, the contract obligated Mr. Barbosa to pay Plaintiff. Any
22 agreement by Plaintiff to then split the payment with Defendant is a separate contract that is not
23 implicated in this claim. Defendant's tortious interference claim relating to the adidas contract fails
24 because Defendant was not a party to the adidas contract. Therefore, there is no enforceable
25 contract between Defendant and Mr. Barbosa with which Plaintiff could interfere. Accordingly,

---

[4] To the extent that Defendant argues that Plaintiff interfered with the Barbosa player contract by giving money to Mr. Barbosa to purchase a Bentley, there is no admissible evidence of this arrangement. Instead, Defendant testified that he may have heard of Plaintiff assisting Mr. Barbosa with the purchase of a Bentley, but that he had no knowledge as to whether the statements were true. See Conger Decl. in Supp. of Pl.'s Mot. Ex. A at 198:18-199:13.

9

Defendant has not raised a triable issue of fact as to Plaintiff's tortious interference with the adidas endorsement contract. Plaintiff's motion for partial summary judgment is granted with respect to Defendant's counterclaim for tortious interference with contractual relationship.

**Tortious interference with prospective economic relationship**

To prevail on a claim for tortious interference with prospective economic relationship under California law with respect to Brandon Wright, Defendant must prove: (1) an economic relationship between Defendant and Mr. Wright containing the possibility of future economic benefit to Defendant; (2) knowledge of the relationship by Plaintiff; (3) intentional acts on the part of Plaintiff designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages to Defendant that were proximately caused by Plaintiff's actions. See Della Penna v. Toyota Motor Sales, USA, Inc., 11 Cal. 4th 376, 388 (1995). Importantly, interference with a prospective business relationship is not actionable unless the Plaintiff's conduct was independently wrongful. Id. at 392-93 ("[A party] seeking to recover for alleged interference with prospective economic relations has the burden of pleading and proving that the defendant's interference was wrongful 'by some measure beyond the fact of the interference itself.'") (citations omitted); see also Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1158 (2003) (citing Della Penna). As stated in Korea Supply:

> An act is not independently wrongful merely because defendant acted with an improper motive. As we said in Della Penna, "the law usually takes care to draw lines of legal liability in a way that maximizes areas of competition free of legal penalties." (Della Penna, supra, 11 Cal.4th at p. 392.) The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their choice of commercial relationships or their pursuit of commercial objectives, unless their interference amounts to independently actionable conduct. An act is "independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." (See Marin Tug & Barge, supra, at p. 835; see also Della Penna, supra, 11 Cal.4th at p. 408 (conc. opn. of Mosk, J.) ["It follows that the tort may be satisfied by intentional interference with prospective economic advantage by independently tortious means"].)

Korea Supply, 29 Cal. 4th at 1158-59 (bribery and offer of sexual favors to foreign officials in order to obtain business contract unlawful under Foreign Corrupt Practices Act, thus "independently wrongful").

Relying on the declaration of William Box, Defendant argues that there is a triable issue of

1 fact as to tortious interference with Defendant's relationship with Mr. Wright. As noted at the
2 hearing and in this Order, however, the Box declaration contains a considerable amount of
3 inadmissible hearsay, including his statements about whether a meeting took place between Plaintiff
4 and Mr. Wright, and about what Mr. Wright's mother may have told Mr. Box. Further, Mr. Box's
5 conclusion as to what Mr. Wright would have done had the meeting at his University been
6 conducted differently is speculative.

7 The Box declaration does, however, contain some admissible evidence. Specifically, Mr.
8 Box testified that Defendant met Mr. Wright during Mr. Wright's junior year in high school, having
9 been introduced to him by Mr. Box. See Box Decl. in Opp. to Pl.'s Mot. ¶ 8. During the next two to
10 three years, Defendant and Mr. Box developed a relationship with Mr. Wright's mother, who did not
11 allow direct contact with Mr. Wright. See id. ¶¶ 8-9. Mr. Wright's mother asked Defendant and Mr.
12 Box to meet with Mr. Wright's college coach at the University of North Carolina. See id. ¶ 11. At
13 the meeting, Mr. Duffy and Mr. Andrews "abruptly and awkwardly" took over the presentation and
14 did not let Defendant say anything despite his four-year relationship with the family. See Box Decl.
15 ¶ 16. Mr. Box also stated that Mr. Duffy was unprepared for the meeting and was disrespectful to
16 Mr. Wright's mother. See Box Decl. ¶ 16. According to Mr. Box, Mr. Duffy took over the meeting
17 because Mr. Wright's coach would not let Mr. Wright sign with Defendant and Mr. Box, or with
18 Plaintiff. See Box Decl. ¶ 18. At some point before the meeting, Mr. Duffy had told Defendant that
19 their business relationship would be terminating, but that Mr. Duffy wanted Defendant to be
20 involved in the Wright discussions. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 145:16-146:6.
21 Mr. Duffy also testified that Defendant was involved with Plaintiff regarding the presentation to Mr.
22 Wright at the University. See Fraser Decl. in Opp. to Pl.'s Mot. Ex. 3 at 147:19-22. Defendant
23 argues that by appearing at the University of North Carolina without informing Defendant, and by
24 usurping the meeting without being prepared, Plaintiff tortiously interfered with the Wright
25 relationship.

26 Even if the Court assumes that Defendant has raised a triable issue of fact as to the other
27 elements of the tort, Defendant has not raised a triable issue of fact as to whether Plaintiff's conduct
28 was independently wrongful. While Defendant argues that Plaintiff acted intentionally or was

11

motivated by spite to interfere with Defendant's relationship with Mr. Wright by taking over the meeting with Mr. Wright's mother and coach and by doing a poor job on the presentation, Defendant has not raised a triable issue of fact that this constitutes unlawful conduct as required under Korea Supply.  Accordingly, Plaintiff's Motion for Partial Summary Judgment as to the counterclaim for tortious interference with prospective contractual relationship is granted.

**2.    Defendant's Motion for Partial Summary Judgment**

Defendant seeks summary judgment on Plaintiff's claims for conversion, money had and received and constructive trust.

**Conversion**

Under California law, the essential elements of conversion are: (1) Plaintiff's ownership or the right to possession of the property at the time of conversion; (2) Defendant's conversion by a wrongful act or disposition of property right; and (3) damages.  See Mendoza v. Rast Produce, Inc., 140 Cal.App.4th 1395, 1404-05 (2006).  Further, to maintain a conversion action, "'it is not essential that the plaintiff shall be the absolute owner of the property converted but she must show that she was entitled to *immediate possession at the time of conversion*.'"  See In re Bailey, 197 F.3d 997, 1000 (9th Cir. 1999) (quoting Bastanchury v. Times-Mirror Co., 68 Cal.App.2d 217, 236 (1945)) (emphasis added).  Significantly, "a mere contractual right of payment, without more, does not entitle the obligee to the immediate possession necessary to establish a cause of action for the tort of conversion."  See Bailey, 197 F.3d at 1000; see also In re Lau Capital Funding, Inc., 321 B.R. 287, 304 (C.D. Cal. 2005); Kassa v. BP West Coast Producers, LLC, 2008 U.S. Dist. LEXIS 61668, at *13-14 (N.D. Cal. Aug. 11, 2008) ("A party that breaches a contract normally does not commit conversion because the contract gives them a right to possess the property at issue.").

In Bailey, a bankruptcy matter, the non-debtor attorney claiming conversion had worked for years as counsel in a personal injury case when the debtor attorney was substituted as counsel.  The debtor attorney retained all settlement proceeds in the personal injury case even though there was an agreement to share those proceeds with the non-debtor attorney.  Following state court litigation between them, the debtor attorney agreed to pay a portion of the settlement proceeds to the non-debtor attorney, but failed to do so.  The bankruptcy court found that the non-debtor attorney's claim

1  for attorney's fees was non-dischargeable in bankruptcy because the non-debtor attorney had a lien
2  on the fees and the debtor attorney knew of the lien, so the debtor attorney's use of the fees
3  constituted conversion.  The Bankruptcy Appellate Panel reversed, and the Ninth Circuit affirmed,
4  stating that there could be no conversion by the debtor attorney because the non-debtor attorney did
5  not have a lien on the settlement proceeds because the fee agreement involved a minor yet had not
6  been approved by the appropriate court under California Family Code § 6602.  Thus, the non-debtor
7  attorney did not have a property interest in the proceeds and had no right to immediate possession of
8  a share of them.

9  Similarly, here, there is no triable issue of fact as to whether Plaintiff has a property interest
10 or lien on the agent fees under either the SPAC or the adidas endorsement contract, as required for
11 the tort of conversion.  Instead, under the agreement between Plaintiff and Defendant to share fees,
12 Plaintiff has nothing more than a "mere contractual right to payment" for the fees under the SPAC.
13 Moreover, Plaintiff has not raised a triable issue of fact as to his entitlement to "immediate
14 possession" of the disputed agent fees under the SPAC.  The evidence is undisputed that in the event
15 of a dispute as to the allocation of payments under an SPAC contract, as in this case, the NBA
16 player's union directs that payments go to the agent of record, which in this case was Defendant.
17 See, e.g., Declaration of John Conger in Opp. to Def.'s Mot. for Partial Summ. J. ("Conger Decl. in
18 Opp. to Def.'s Mot.") Ex. A at 74:16-75:16; Reply Declaration of Mia Fraser in Supp. of Def.'s Mot.
19 for Partial Summ. J. Ex. 1 at 33:18-25.  There is no evidence that Plaintiff was instead entitled to
20 immediate possession of the fees.  Although there is a dispute as to whether the agent of record is
21 thereafter permitted to retain those payments under the SPAC, especially in light of the agreement
22 between the parties to share those fees (see, e.g., Conger Decl. in Opp. to Def.'s Mot. Ex. A at
23 209:1-13), that dispute is properly the subject of a contract claim, not a tort claim.

24 Further, although the adidas contract specified that fees were to be paid to Plaintiff, those
25 fees were paid to Defendant (see Conger Decl. in Opp. to Def.'s Mot. Ex. B at 188:21-1889:2;
26 224:11-14), who retained them, forming the basis for a breach of contract claim, but not a
27 conversion claim in the absence of a lien or other property interest.  Accordingly, summary
28 judgment is granted on Plaintiff's conversion claim.

13

**Money had and received**

"The foundation of an action for conversion on a money had and received count is the unjust enrichment of the wrongdoer, and in order for plaintiff to recover in such action she must show that a definite sum, to which she is justly entitled, has been received by defendant." Bastanchury v. Times-Mirror Co., 68 Cal.App.2d 217, 236 (1945). A claim for money had and received can be joined with a breach of contract claim. See Philpott v. Superior Court, 1 Cal.2d 512, 518 (1934); Haggerty v. Warner, 115 Cal.App.2d 468, 474-75 (1953).

Defendant argues conclusorily that Plaintiff's claim for money had and received fails because Defendant is legally and equitably entitled to any payments under the SPAC and endorsement contracts, and that Plaintiff has conceded that the payments were not improper. Defendant's claim, however, is unsupported by the evidence he cites. Rather, the evidence demonstrates that if there is a dispute as to which person should be paid, the NBA Player's Union rules provide that payments under the SPAC go to the agent of record. See, e.g., Conger Decl. in Opp. to Def.'s Mot. Ex. A at 74:16-75:16; Reply Declaration of Mia Fraser in Supp. of Def.'s Mot. for Partial Summ. J. Ex. 1 at 33:18-25. There is no evidence that the Player's Union rules establish that the agent of record is entitled to keep those payments despite a separate contract to turn some or all of them over to a principal. Further, although Defendant has received payments under the adidas contract, the contract itself states that the payments were to be made to Plaintiff, so Defendant's entitlement to retain those payments is disputed. Therefore, there is a triable issue of fact as to whether Defendant was entitled to retain the payments under the Barbosa contracts. Summary judgment is denied on Plaintiff's claim for money had and received.

**Constructive trust**

California Civil Code section 2223 states that: "One who wrongfully detains a thing is an involuntary trustee thereof, for the benefit of the owner." Further, California Civil Code section 2224 states:

> One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he or she has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it.

A constructive trust, however, does not necessarily require fraud or other wrongful conduct. See GHK Associates v. Mayer Group, Inc., 224 Cal.App.3d 856, 878 (1990) ("Fraud or intentional misrepresentation is not required for a constructive trust to be imposed. A breach of contract or intentional interference with contract can make the offending party a constructive trustee.") (internal citations omitted). Defendant testified that his understanding was that as long as Plaintiff and Defendant worked together, monies received under the contract with Mr. Barbosa as re-negotiated in 2006 would be split evenly. See Conger Decl. in Opp. to Def.'s Mot. Ex. B at 166:3-9. Defendant also testified that payments under the adidas contract were to be split evenly. See id. Ex. B at 194:20-195:6. Therefore, Plaintiff argues that because Defendant has breached the contract between them by retaining all of the funds (See id. Ex. B at 188:21-24; 188:25-189:2), Defendant is liable for a constructive trust.

For the same reasons stated above with respect to the money had and received claim, there is a triable issue of fact as to constructive trust. Defendant's evidence only supports the witnesses' understanding of the NBA rules about what is to be done with payments initially pending resolution of a dispute about which person is to receive payments under the SPAC, and do not address the question of whether Defendant is entitled to retain the funds under the SPAC or the adidas endorsement contract thereafter regardless of any contract with Plaintiff regarding sharing the proceeds. Further, Defendant testified that he was only to receive half of the funds from the SPAC, yet he retained all of them. In addition, Defendant appears to have abandoned summary judgment on this claim as it is not addressed in his reply brief. Therefore, summary judgment as to the constructive trust claim is denied.

**CONCLUSION**

Plaintiff's Motion for Partial Summary Judgment is granted. Defendant's Motion for Partial Summary Judgment is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated: April 27, 2009

ELIZABETH D. LAPORTE
United States Magistrate Judge

15